## Dinsmoor, et al. v. Combs.

(Decided November 16, 1917.)

### Appeal from Wolfe Circuit Court.

1.  Mines and Minerals—Leases of Land for Oil and Gas—Abandonment—Cancellation.—Leases of land for the exploration and development of oil and gas are executed by the lessor in the hope and upon the condition, either expressed or implied, that the land will be developed and thoroughly tested, and that unless the lessee does actually develop the leased land, and in good faith diligently operate under the lease, it will be deemed to have been abandoned and will be cancelled.

2.  Mines and Minerals—Lease of Land for Oil and Gas—Implied Stipulation.—Where the number of wells to be drilled is not specified in the lease of land for the exploration and development of oil and gas there is an implied stipulation that the lessee will fully develop the land by sinking sufficient wells to secure to the lessor a reasonable royalty.

3.  Mines and Minerals—Lease of Land for Oil and Gas—Cancellation.—Where a lease of land for the exploration and development of oil provided for its forfeiture in case the lessee ceased to operate on the leased premises, and the lessee continued to operate a single well which produced a small amount of oil paying to the lessor her royalty thereon, the lessor will not be permitted to sue to cancel the lease until after she shall have demanded of the lessee that he further develop the land and have given him an opportunity to do so.

G. C. ALLEN for appellants.

G. B. STAMPER for appellee.

OPINION OF THE COURT BY JUDGE MILLER—Reversing.

On November 28, 1904, Pocahontas Combs and A. T. Combs, her husband, leased to J. A. McCormack, the oil and gas rights and privileges in a tract of 175 acres of land in Wolfe county for a period of 10 years and for so long thereafter as either oil or gas should be produced therefrom by McCormack, his successors or assigns. The land belonged to Pocahontas Combs, and the consideration for the lease was the agreement by McCormack to deliver to her one-eighth of all the oil produced from the leased premises, and to pay her $100.00 per year for each gas well that might be drilled upon the land.

By express stipulations in the lease McCormack further agreed: (1) to commence operations on the leased land, or on the adjoining land of S. M. Tutts, and push

the work with due diligence until a well should be completed, under penalty of forfeiting the lease; (2) that if the first well drilled should not prove to be a good or producing well McCormack would surrender the lease, or proceed within sixty days thereafter to drill other wells upon the leased premises; and (3) that if at any time McCormack ceased to drill or operate on the leased premises, or should remove his drilling machinery therefrom, the lease should be null and void and be surrendered to the lessors.

In April or May, 1905, McCormack drilled a producing well upon the leased premises which is known and identified in this record as well No. 2; and, in the winter or spring of 1906, he drilled another well which is known as well No. 1, and is located about 600 feet east of well No. 2. Well No. 1 produced oil in small quantities for a short time; but it was soon exhausted and for the last six years it has been abandoned.

On May 22, 1906, McCormack assigned the lease to the Torrent Oil Company; and, on February 19, 1911, the Torrent Oil Company, in turn, assigned the lease to the appellants, J. D. Dinsmoor, and his associates, doing business as the Mountain Oil Company.

While well No. 2 was a fairly good producer of oil at first, its flow soon rapidly decreased, and for many years it has produced only so small a quantity of oil as to make it unprofitable if operated by itself. The appellants, however, have been operating it for several years with the power which they use in operating their well upon an adjacent tract; and, in this way only can they make it pay.

When the Dinsmoors bought this lease in 1911 they attempted to pump well No. 1, but it failed to produce anything. Up to that time well No. 2, which had been pumped all the time, was producing about three-quarters of a barrel of oil a day; and, when the depositions were taken in this case it was producing only one-half barrel a day. These two were the only wells that were drilled upon the leased premises, by McCormack or his lessees.

Several wells had, however, been drilled by the Dinsmoors upon adjoining tracts upon which they had leases. A producing well had been drilled upon the Rowland tract about 1,100 feet from well No. 2, and this Rowland well is still a producing well in a small way. On the Hobbs tract immediately northwest of the leased premises a small producing well was drilled, which soon went

dry. On the C. F. Horton tract, which adjoined the Hobbs tract, another small producing well was drilled, while one dry well and one well nearly dry were drilled upon the tract of the widow Horton. Two small producing wells are drilled upon another adjoining tract belonging to C. F. Horton, but they soon went dry. On the adjoining tract of S. M. Tutts, there was a dry hole; no drilling was done on the W. S. Tutts adjoining tract; and there was a dry hole on the adjoining Childers tract.

With the exception of the Rowland well above referred to all the oil wells on the adjacent tracts have been abandoned; and the Rowland well which is owned and operated by the Dinsmoors produces only about one-half a barrel of oil a day.

In April, 1914, however, Mrs. Combs and her husband executed another lease to the Stillwater Oil Company, whereby she conveyed to that company the oil and gas privileges upon the same tract of land which she had theretofore conveyed to McCormack and which is the subject of this litigation, reserving, however, from said lease 400 feet around well No. 2, which was being operated by Dinsmoor in the manner heretofore stated. Pending this litigation the Stillwater Oil Company, in 1914, drilled a well upon the leased premises known as Center well No. 3, which produced only a small quantity of oil. It was soon abandoned as worthless and the oil company removed its tools and machinery.

Subsequently, Mrs. Combs sold the surface of the leased land and a one-half interest in the oil and gas produced on it, to O. T. Asberry.

On April 14, 1914, Pocahontas Combs and E. T. Combs, her husband, and O. T. Asberry filed this action against Dinsmoor and his associates to cancel the lease for breach of the contract, and to recover damages. Judgment went for the plaintiffs by default; but upon the motion of the defendants the judgment was set aside and an answer was filed.

The answer contains a traverse of the petition, and an affirmative statement of the facts as above narrated; and, it also relies upon a settlement of Mrs. Combs' claims by the payment of $25.00 to A. T. Combs on September 8, 1914, as the agent of his wife.

The Stillwater Oil Company filed its intervening petition and was made a party to the action, asking for a cancellation of the Dinsmoor lease, and that it be adjudged the owner of the oil and gas privileges in the leased premises,

Upon a trial the chancellor entered a judgment cancelling the lease, reserving, however, to the Dinsmoors well No. 2, with 600 feet of ground around it, in every direction; and, he reserved the question of damages for further adjudication. From that judgment the Dinsmoors appeal. The court dismissed the petition of the Stillwater Oil Company, but it has not appealed.

As no gas was ever found, that subject is eliminated from this litigation. It relates only to the production of oil.

It is the contention of the appellees, who were the plaintiffs below, that McCormack and his assignees failed and refused to properly develop the leased land so as to produce oil therefrom, and that the lease was properly cancelled for that reason. On the other hand, the appellants contend that since as many wells have been drilled upon the leased premises as were necessary to develop the property, and that further drilling of wells thereon would have entailed a very great expenditure of money without any adequate return, Mrs. Combs' right to rescind the contract did not exist for that reason.

In Soaper v. King, 167 Ky. 121, this court held under a lease similar in terms to the one now before us, that when oil or gas is found on the leased premises in paying quantities the lessee is bound to diligently work and operate it so as to bring the product to a present market and thus to promptly yield to the lessor his royalty; and that, unless the lessee does actually develop the leased land, and in good faith diligently operate under the lease it will be deemed to have been abandoned and will be cancelled.

All leases of land for the exploration and development of oil and gas are executed by the lessor in the hope and upon the condition, either expressed or implied, that the land will be developed and thoroughly tested; and it would be unjust and unreasonable, and contrary to the nature and spirit of the lease to allow the lessees to continue to hold the lease any considerable length of time without making any effort to further develop the land according to the express or implied purpose of the contract. Berry v. Frisbie, 120 Ky. 343; Monarch Oil, Gas & Coal Co. v. Richardson, 124 Ky. 602; Breckenridge Asphalt Co. v. Richardson, 147 Ky. 834; Eastern Kentucky M. & T. Co. v. Swan-Day Lumber Co., 148 Ky. 82, 46 L. R. A. (N. S.) 672; Killebrew v. Murray, 151 Ky. 345; Chandler v. French, 73 W. Va. 685, L. R. A. 1915B 561; Collins v. Mt. Pleasant Oil & Gas Co., 85 Kan. 483, 38

L. R. A. (N. S.) 134 and note; Culbertson v. Iola Portland Cement Co., 87 Kan. 529, Ann. Cas. 1914A, 610; Thornton's "The Law Relating to Oil and Gas," section 169.

And, where the number of wells to be drilled is not specified in the contract, as here, there is an implied obligation that the lessee will fully develop the land by sinking sufficient wells to secure to the lessor a reasonable royalty. Culbertson v. Iola Portland Cement Co., 87 Kan. 529, Ann. Cas. 1914A, 610. Appellants contend that they have thus complied with their contract by drilling two wells on the leased premises which have proved to be a thorough test of the leased land as a non-producer of oil and gas; and, although they have drilled no additional wells upon the leased premises during the last seven or eight years, and only one of the wells is now a producer and in exceedingly small quantities, they nevertheless claim they have the right to hold the entire tract under their lease, while operating well No. 2, and are not required to drill additional wells because it would be unprofitable for them to do so.

Preliminary, however, to the consideration of these questions bearing upon the merits of the case, appellants insist it was error for the chancellor to cancel their lease when no demand for further development had ever been made upon them by Mrs. Combs; and in support of this contention they rely upon the leading case in this jurisdiction of Monarch Oil Company v. Richardson, 124 Ky. 602. In that case the lease was similar in its controlling features, to the lease under consideration, except that there the lessee had the right to develop the land or pay rent, and had paid rent. In this case, however, since McCormack made the necessary initial development, and Mrs. Combs has received her royalty for years without complaint, the status of the lessees in this case was like that of the lessee in the Richardson case, with respect to the right of the lessor to terminate the lease.

In denying the lessor's right to cancel the lease in the Richardson case the court said:

"It is true, as said by counsel for appellant, that forfeitures are not generally favored by the law, but forfeitures which arise in gas and oil leases by reason of the neglect of the lessee to develop or operate the leased premises are rather favored because of the peculiar character of the product to be produced. Hence, it has been found necessary to guard the rights of the landowner as well as public interest by numerous covenants, some

of the most stringent kind, to prevent their land from being burdened by unexecuted and profitless leases incompatible with the rights of alienation and the use of the land. Forfeiture for non-development or delay is essential to private and public interest in relation to the use and alienation of property. Perhaps in no other business is prompt performance of contracts so essential to the rights of the parties, or delay by one party likely to prove so injurious to the other. Thornton on the Law Relating to Oil and Gas, section 148; Brown v. Vandergrift, 80 Pa. 142. This contract, however, can be so construed as to effectuate the intention of the parties in a manner that will do justice to the lessor as well as the lessee without arbitrarily cancelling it, as was done by the judgment of the lower court, and this result may be accomplished by requiring the lessor to give notice to the lessee that he will not accept the annual rentals and permit his land to remain idle and undeveloped, but will require the lessee to execute the contract according to the intention in the minds of the parties at the time it was made by commencing in good faith its development, and, if the lessee does not, within a year from the notice, in good faith commence a well on the premises, the lessor at at expiration of that time may have the lease forfeited. The lessor in this contract did not at any time exact or demand of the lessee that it commence operating for oil or gas, but accepted the annual rentals paid in full discharge of the obligations of the contract, although at the end of any rental period he might have declined to accept rent and required the lessee to begin operations for oil or gas.''

To the same effect see Indiana Natural Gas & Oil Co. v. Beales, 166 Ind. 684; American Window Glass Co. v. Indiana Natural Gas & Oil Co., 37 Ind. App. 439. And, as to the effect of a provision for an extension of the term for so long a time as oil or gas is produced, see 18 Rul. Cas. Law, p. 1210; South Penn. Oil Co. v. Snodgrass, 71 W. Va. 438, 43 L. R. A. (N. S.) 849, with note; Lowther Oil Co. v. Miller-Sibley Oil Co., 53 W. Va. 501, 97 A. S. R. 1027; Colgan v. Forest Oil Co., 194 Pa. St. 234, 75 A. S. R. 695.

The second condition in the lease only required McCormack to drill one good or producing well in order to preserve his rights as lessee, and that he did when he drilled well No. 2. And, as he or his assignees have continued to operate well No. 2, ever since, paying Mrs. Combs her royalty, the case comes within the equitable

principle announced in the Richardson case, which makes it the duty of the lessor to notify the lessee that she requires further development which must be followed by the lessor's failure to comply before she can insist upon a forfeiture.

In this case, the lease ran for ten years from November 28, 1904, and for so long a time thereafter as either gas or oil should be produced therefrom, and oil has continuously been produced, sometimes in large quantities, and at others in small quantities.

But, before the expiration of the ten-year term Mrs. Combs again leased the gas and oil privileges to the Stillwater Oil & Gas Co.; sold the surface and a half interest in the McCormack lease to Asberry; and then filed this suit on April 14, 1914, to cancel the lease.

Under these circumstances, we are clearly of the opinion that she can cancel the lease, if at all, only after reasonable notice and opportunity to the lessees to further develop the land.

As that was not given the judgment is reversed, with instructions to the circuit court to dismiss the petition.